UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES D. HEATHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:13CV61 TIA |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying James D. Heathman's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, *et seq.*  All matters are pending before the undersigned United States

Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Because the Commissioner failed to consider relevant evidence of record, the final

decision is not supported by substantial evidence on the record as a whole and is

reversed.

## I.  Procedural History

On June 10, 2011, plaintiff James D. Heathman applied for disability

insurance benefits (DIB) claiming he became disabled on January 1, 2004, because

of heart problems and rotator cuff problems.  (Tr. 165-71, 193.)  Plaintiff subsequently amended his alleged onset date to October 14, 2005.  (Tr. 184.) Upon initial consideration, the Social Security Administration denied plaintiff's claim for benefits.  (Tr. 108, 110-14.)  At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on October 30, 2012, at which plaintiff and a vocational expert testified.  (Tr. 31-97.)  On December 7, 2012, the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff to have last met the insured status requirements of the Social Security Act on December 31, 2008; and that vocational expert testimony supported a finding that, through such date, plaintiff could perform work as it existed in significant numbers in the national economy.  (Tr. 8-25.)  On April 26, 2013, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-6.)  The ALJ's decision thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ wholly failed to consider certain opinion evidence rendered by his treating physician, Dr. Bragg, which was relevant to his disability during the insured status period.  Plaintiff also contends that the ALJ erred by failing to obtain testimony from a medical advisor to determine the date of disability onset.

Plaintiff requests that the final decision be reversed and the matter be remanded for an award of benefits or for further consideration.

## II.  Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on October 30, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty-seven years of age.  On October 14, 2005, the alleged onset date of disability, plaintiff was fifty years of age.  Plaintiff stands five feet, eleven inches tall and weighs 195 pounds.  Plaintiff is right-handed.  (Tr. 36-37.)  Plaintiff is married and has two children and three step-children, the youngest of which is twenty-one years old.  (Tr. 37-38.)  Plaintiff completed the twelfth grade in high school and received no additional training. (Tr. 39.)

Plaintiff's prior work consisted of auto body repair and restoring vehicles. Plaintiff continues to perform this work but for no more than eight hours a week. (Tr. 39-40.)  Plaintiff testified that, in order to perform such work, a person must be able to weld, sand, and lift up to sixty-five pounds.  Plaintiff testified that he last lifted the heavier weight required in 2008 or 2009.  Plaintiff testified that he can currently lift up to twenty pounds and will get someone to help him if he needs to lift anything heavier for his work.  (Tr. 42-44.)

Plaintiff testified that he applied for disability benefits in 2004 after he had two heart attacks.  Plaintiff testified that he withdrew that application, however, because he was able to work and wanted to continue to work.  Plaintiff testified that he could not presently work full time because of problems with his arms, shoulders, and back and because of numbness in his feet.  Plaintiff testified that he currently works in the auto shop for about an hour to an hour and a half but then must go home and put his feet up.  Plaintiff testified that he can no longer hold a paint gun.  Plaintiff testified that he cannot drive for any period of time and has difficulty lifting.  (Tr. 45-47.)

With respect to the period before his insured status expired, that is, on or before December 31, 2008, plaintiff testified that he was constantly tired and did not have the energy to perform work on a full time basis.  Plaintiff testified that he needed to elevate his legs at least twice a day during this time and would experience pain and fatigued legs if he did not do so.  Plaintiff testified that his level of fatigue has increased within the past couple of years.  (Tr. 48, 65-66.)

Plaintiff testified that he also had sleep apnea during the relevant period but could not use a CPAP machine because of difficulties wearing the mask.  Plaintiff testified that mold issues prevented him from using oxygen at night.  (Tr. 48-49.)

Plaintiff testified that he has had arthritis in his right hand since he was twenty-one years of age and was not able use his right hand for auto body work.

(Tr. 50-51.)

Plaintiff testified that he currently experiences low back pain that radiates to his left leg and causes numbness in his foot. Plaintiff testified that recent x-rays show arthritis in his back. Plaintiff testified that he also had three surgeries for hernia repair and underwent rotator cuff surgery in 2011 for issues he had with his shoulder since 2009. (Tr. 50-51.) Plaintiff testified that he currently has little pain in his shoulders and arms if he keeps his arms at his side but that the pain worsens with reaching. (Tr. 56.)

Plaintiff testified that he currently takes the same medication he took prior to December 31, 2008, including medication for blood pressure and cholesterol, Celebrex for arthritis, Nexium, aspirin, and occasional Prednisone for his back and shoulders. Plaintiff testified that Celebrex helps with his arthritis. Plaintiff testified to having recently been prescribed a muscle relaxant. Plaintiff testified that his medication causes him to feel tired. (Tr. 51-53.)

As to his current exertional abilities, plaintiff testified that he can sit for five minutes before needing to change positions. Plaintiff testified that he can stand for ten minutes and walk about one block. Plaintiff testified that he can lift no more than twenty pounds and has problems reaching outward and overhead with both arms. Plaintiff testified that problems with his left knee prevent him from kneeling but that he can stoop, crouch, and crawl. Plaintiff testified that these limitations

were not "this bad" in 2008 and have gradually worsened.  (Tr. 58-60.)

As to his exertional abilities in 2008, plaintiff testified that he worked five to six hours a day and could stand up to four hours at one time.  Plaintiff testified that he has had trouble gripping with his right hand since 2004.  (Tr. 66-68.)

As to his daily activities during the relevant period, plaintiff testified that he was lifting a lot more weight in 2008 and suffered hernias as a result.  Plaintiff testified that he was able to mow the lawn and do house repairs but needed to rest afterward.  (Tr. 60-61, 70.)  Plaintiff testified that he napped twice a day in 2008 for about an hour and a half, and would be in bed by 7:30 p.m. if he did not take such naps.  (Tr. 67.)

B.     <u>Vocational Expert Testimony</u>

John F. McGowan, a vocational expert, testified at the hearing on October 30, 2012, in response to questions posed by the ALJ and counsel.

Mr. McGowan classified plaintiff's past relevant work as an auto body repairman as medium and skilled, and as an automotive painter as medium and semi-skilled.  (Tr. 74-75.)

The ALJ asked Mr. McGowan to assume an individual limited to light work except with no overhead reaching; no more than occasional climbing of ramps and stairs; occasional balancing; and no climbing of ladders, ropes, or scaffolds.  Mr. McGowan testified that such a person could not perform any of plaintiff's past

relevant work but, with a sit/stand option, could perform work as a hospital products assembler, of which 1,500 such jobs exist in the State of Missouri and 26,400 nationally; small electrical parts assembler, of which 262 such jobs exist in the State of Missouri and 8,028 nationally; and personal home health aide/ companion, of which 3,900 such jobs exist in the State of Missouri and 141,000 nationally. (Tr. 75-77.)

The ALJ then asked Mr. McGowan to assume the same individual would have to alternate between sitting, standing, and walking every forty-five minutes at will, to which Mr. McGowan testified that the person could perform the jobs previously identified except for hospital products assembler. Mr. McGowan testified that such a person could also perform work as an electronic equipment final inspector, of which 410 such jobs exist in the State of Missouri and 21,561 nationally. (Tr. 77-78.)

The ALJ then asked Mr. McGowan to assume the individual had limited grip in one hand, to which Mr. Gowan testified that the person could continue to perform work as a personal health aide/companion. (Tr. 78-79.) Mr. McGowan testified that if such a person could use their hands occasionally, he could perform work as a film processing counter clerk, of which 1,042 such jobs exist in the State of Missouri and 414,730 nationally; school bus monitor/children's attendant, of which 1,020 exist in the State of Missouri and 79,280 nationally; and lobby

attendant/ticket taker, of which 800 such jobs exist in the State of Missouri and 21,400 nationally.  (Tr. 80-82.)

Counsel asked Mr. McGowan to assume that the same individual had to avoid concentrated exposure to cold, heat, high humidity, and wetness; avoid moderate exposure to solvents and cleaners, fumes, odors, gases, dusts, and chemicals; and avoid all exposure to cigarette smoke.  (Tr. 84.)  Mr. McGowan testified that such a person could continue to perform work as a counter clerk, lobby attendant, and children's attendant as such work is defined in the *Dictionary of Occupational Titles*.  (Tr. 88-89.)

Counsel then asked Mr. McGowan to assume the same person needed to elevate his legs at seventy degrees for twenty percent of an eight-hour workday, to which Mr. McGowan testified that such a condition would preclude competitive employment.  Mr. McGowan also testified that work would not be available for a person who needed two to three breaks a day, for thirty minutes to two hours each; or for a person who would miss work at least three days a month because of his impairments.  Mr. McGowan testified that a person could possibly miss one day a month but may not be able to keep his job if such an absence occurred every month.  (Tr. 90-91.)

### III.  Medical Records Before the ALJ

Plaintiff visited Dr. Thomas A. Bragg, D.O., on January 9, 2003, with

complaints of stomach trouble, nightmares, and joint pain in the shoulders and elbows. Physical examination showed plaintiff to look tired but not to have any acute pain. Dr. Bragg diagnosed plaintiff with history of irritable bowel syndrome (IBS), anxiety, sleep deprivation, chronic arm and shoulder pain, gastroesophageal reflux disease (GERD), and gastritis. Plaintiff was prescribed Nexium, NuLev, and Ambien. Dr. Bragg noted that plaintiff may need to undergo upper endoscopy, sleep studies, and testing for rheumatoid disorders if the medication regimen was unsuccessful. (Tr. 344.)

During a general physical examination on October 16, 2003, plaintiff's extremities were noted to be "completely normal." Abdominal examination was likewise normal. Dr. Bragg prescribed Lexapro for chronic depression. (Tr. 342.)

Plaintiff visited Dr. Bragg on May 7, 2004, and reported being very tired and having leg pain while walking. Plaintiff reported recent chest pain while moving furniture, with such pain radiating to his left arm and left jaw. Dr. Bragg noted a cardiac CT profile performed that same date to show significant coronary atherosclerosis. Dr. Bragg diagnosed plaintiff with coronary artery disease (CAD) and instructed him to take aspirin. Plaintiff was referred to cardiology for an angiography. (Tr. 341, 366.)

Upon admission to Boone Hospital Center that same date, plaintiff was diagnosed with acute inferior myocardial infarction, and angioplasty stenting of the

right coronary artery was performed. Plaintiff was discharged on May 9 and was instructed not to engage in heavy lifting or exercise for two days, and not to work for two weeks. (Tr. 398-402.) Plaintiff underwent stent placement in the left anterior descending coronary artery on May 19. Upon discharge, plaintiff was instructed to avoid heavy lifting or strenuous activity for the next week, and to resume normal activity thereafter. (Tr. 426-27.)

Plaintiff visited the Electrophysiology Clinic at the Missouri Heart Center on June 29, 2004, with complaints of fatigue, shortness of breath, dyspnea, and depression. Physical examination was unremarkable. Dr. Dan L. Pierce questioned whether such symptoms were medication-related, and plaintiff's medications were adjusted. (Tr. 397.)

On October 1, 2004, Dr. Bragg noted plaintiff to have carpal tunnel syndrome in both hands "badly" as well as a problem with depression. Wellbutrin was prescribed to help with smoking cessation. It was noted that Dr. Bragg would help with a letter to assist plaintiff in getting a grant to return to college. (Tr. 339.)

Plaintiff returned to the Electrophysiology Clinic on March 10, 2005, and reported having no chest pain or shortness of breath but that he continued to experience depression. It was noted that plaintiff may have carpal tunnel syndrome. Dr. Pierce noted plaintiff's current medications to be aspirin and Nexium. Physical examination was unremarkable. Dr. Pierce determined

plaintiff's cardiac course to be stable with no angina or heart failure. Dr. Pierce further noted that plaintiff was "basically off of his cardiac medications because of side effects, which have included severe fatigue and 'sleeping all the time.'" Dr. Pierce determined not to change plaintiff's medication therapy, and plaintiff was instructed to return in one year. (Tr. 396.)

Plaintiff visited Dr. Bragg on December 1, 2005, and reported having severe fatigue during the day and never feeling rested. Plaintiff's wife reported that he stopped breathing in his sleep. Dr. Bragg observed plaintiff to appear very fatigued. Dr. Bragg diagnosed plaintiff with chronic fatigue with a strong possibility of a significant sleep disorder. (Tr. 330.) A sleep study conducted on December 27 showed severe obstructive sleep apnea with oxygen desaturation to seventy-nine percent. A second study was recommended for CPAP titration. (Tr. 393.)

On March 22, 2006, Dr. Bragg diagnosed plaintiff with probable IBS given plaintiff's symptoms of cramping and mild lower quadrant tenderness. (Tr. 327.) An upper endoscopy performed in April showed reflux esophagitis and gastritis. (Tr. 263-64.)

Plaintiff returned to the Electrophysiology Clinic on May 30, 2006, and reported to Dr. Pierce that he took himself off of all cardiac and cholesterol medications because of fatigue. Plaintiff reported that he continued to have

problems with sleep apnea and was intolerant of all BIPAP and CPAP masks attempted.  Physical examination was unremarkable.  Dr. Pierce determined plaintiff's cardiac course to be stable with no angina or heart failure symptoms.  It was noted that plaintiff did not want to begin cardiac medications.  Dr. Pierce recommended that plaintiff restart a decreased dosage of baby aspirin and begin taking Zetia.  Dr. Pierce also recommended that plaintiff use nasal prongs with oxygen supplementation given his intolerance of breathing masks.  Plaintiff was instructed to return in six months.  (Tr. 384.)

On July 27, 2006, plaintiff complained to Dr. Bragg that he was experiencing a lot of joint pain everywhere.  Dr. Bragg noted plaintiff to have a lot of pain in both thumbs and his shoulder, with decreased abduction and external rotation.  Pain in the elbows was also noted.  Dr. Bragg diagnosed plaintiff with degenerative joint disease and prescribed Celebrex.  (Tr. 326.)

On October 17, 2006, plaintiff complained to Dr. Bragg that he had mid-back pain and stomach pain.  Range of motion about the cervical and upper thoracic spine was noted to be decreased.  Muscle spasm was also noted.  Dr. Bragg diagnosed plaintiff with somatic dysfunction[1] as well as allergies, chronic

---

[1] "Somatic dysfunction" is a term of art used in the field of osteopathy and is defined as the "[i]mpaired or altered function of related components of the somatic (body framework) system: skeletal, arthrodial and myofascial structures, and their related vascular, lymphatic, and neural elements."  American Ass'n of Colleges of Osteopathic Med. (AACOM), *Glossary of Osteopathic Terminology* 53 (rev. Nov. 2011).  "Somatic dysfunction is treatable using osteopathic manipulative treatment."  *Id.*

sinusitis, chronic sleep apnea, cephalgia, gastritis, and hyperlipidemia. Medication was prescribed and osteopathic manipulative treatment (OMT) was given with good results. (Tr. 323.) Continued decreased range of motion was noted on November 14 with a noted increase in blood pressure. OMT was applied to the thoracic and cervical spine. Plaintiff was instructed to return later in the week to recheck his blood pressure. (Tr. 322.)

Plaintiff visited Dr. Bragg on May 24, 2007, and requested another treatment for his back. Generalized decreased range of motion was noted about the lumbar, thoracic, and cervical spine. Dr. Bragg also noted a shortening of the right leg which was causing some of the low back pain. Straight leg raising was negative. Plaintiff was diagnosed with somatic dysfunction, and OMT was given with good results. (Tr. 316.)

Plaintiff returned to Dr. Bragg on November 29, 2007, who noted plaintiff's blood pressure to be high. Plaintiff reported occasional shortness of breath but denied any chest pain. Azor was prescribed. On December 4, plaintiff reported continued elevated blood pressure. Plaintiff was instructed to increase his dosage of Azor. (Tr. 311.)

On January 4, 2008, plaintiff reported to Dr. Bragg that he had been out of blood pressure medication for a while. Plaintiff currently experienced headaches, which Dr. Bragg opined to be muscular in nature. Dr. Bragg noted some decreased

range of motion about the cervical spine. Plaintiff was diagnosed with hypertension and somatic dysfunction. OMT was applied with good results. Plaintiff was prescribed Azor and was instructed to keep a close eye on his blood pressure. (Tr. 310.)

On February 7, 2008, plaintiff was diagnosed as having a direct inguinal hernia with examination showing a large, reducible, anterior bulge with some pain. Dr. Bragg recommended repair as soon as possible. (Tr. 309.) On February 11, plaintiff reported doing better but that he had recently tried to work and do some lifting, which created "trouble" with the hernia. Plaintiff was referred for surgery. (Tr. 308.) Upon consultation with Dr. Peter D. Perll on February 15, hernia repair surgery was scheduled for February 29. (Tr. 383.)

On February 21, 2008, plaintiff reported to Dr. Bragg that he had been out of his blood pressure medication for a while. (Tr. 307.)

Plaintiff visited Dr. Perll on March 10, 2008, for surgical follow up. Plaintiff was noted to be doing well. Dr. Perll advised plaintiff that he could return to his routine "using common sense." Plaintiff was instructed not to engage in a lot of repetitive bending and heavy lifting until he "let the area settle down a little more" and was accustomed to it. (Tr. 382.)

On March 20, 2008, Dr. Bragg noted plaintiff's blood pressure to continue to be elevated. Plaintiff reported that he was still without medication. (Tr. 306.)

In May 2008, plaintiff reported to Dr. Bragg that he experienced stomach cramping. Abdominal examination was normal. Plaintiff was diagnosed with improved hypertension, IBS, and history of gastritis. Dr. Bragg prescribed Cymbalta for anxiety and depression, which were noted to be plaintiff's biggest problems due to stress caused by several domestic issues. (Tr. 304-05.)

Plaintiff visited Dr. Bragg on September 23, 2008, with complaints of significant low back pain radiating to his right hip, leg, and foot. Plaintiff reported that chiropractic treatment did not help. Physical examination showed tenderness in the affected areas. Plaintiff was diagnosed with acute sciatic neuritis with ligament strain to the right foot, probably secondary to back trouble. OMT was given with good results, and Prednisone and Lyrica were prescribed. (Tr. 301.)

Plaintiff visited Dr. Bragg on November 18, 2008, with complaints of left lower quadrant pain. Physical examination was positive for inguinal hernia, and plaintiff was referred for surgery. (Tr. 300.)

On December 2, 2008, plaintiff reported to Dr. Bragg that he experienced constant pain in his abdomen and vomited each time he ate. Examination showed diffuse tenderness about the abdomen and epigastrium. A CT scan of the abdomen and pelvis showed moderate-sized hiatal hernia, prominent size of the pancreatic head with blunting of the uncinate process, diverticulosis, right inguinal canal thickening, and small periumbilical hernia. (Tr. 299, 365.)

In a letter to Dr. Bragg dated December 4, 2008, Dr. Philip S. McIntire reported that his evaluation of plaintiff for lower abdominal discomfort showed a small umbilical hernia and a left inguinal hernia, but was otherwise unremarkable. Plaintiff exhibited no gross motor or sensory deficits during the evaluation. Surgical repair to both hernias was recommended. (Tr. 380-81.)

An EKG performed on December 23, 2008, in preparation for hernia surgery was normal except for evidence of left frontal branch block. (Tr. 297.)

On January 6, 2009, plaintiff reported to Dr. Bragg that he was having stomach problems again after having stopped Nexium. Dr. Bragg recommended that plaintiff have an MRI but plaintiff declined and requested continued treatment. Nexium was restarted. It was noted that plaintiff was healing well after recent hernia repair. (Tr. 296.)

Plaintiff visited Dr. Bragg in May 2009, with reports of experiencing dizziness while working in his shop. Upon questioning and examination, Dr. Bragg determined the symptoms to be secondary to breathing paint fumes. (Tr. 292.)

On July 13, 2009, plaintiff reported to Dr. Bragg that he experiences shortness of breath with exertion and that it worsened the previous weekend when he was trying to pull a boat up on a trailer. Dr. Bragg noted plaintiff's history of CAD and referred plaintiff to his cardiologist. (Tr. 289.)

On that same date, plaintiff underwent a cardiology consultation with Dr. Pierce. Plaintiff reported that he recently experienced severe shortness of breath and dyspnea with "his usual pushing his boat off the dock." Plaintiff reported that such activity typically did not cause symptoms. Plaintiff also reported increasing leg weakness and fatigue over the last two to three weeks. Dr. Pierce noted plaintiff's medications to include Nexium, Bystolic, Benicar, aspirin, and recent antibiotic therapy and Decadron injection. Physical examination was unremarkable. Dr. Pierce diagnosed plaintiff with increasing symptoms consistent with angina, hypertension, and sleep apnea. Dr. Pierce did not change plaintiff's cardiac medications but instructed plaintiff to take nitroglycerin as needed. A cardiac catheterization was scheduled for the following day. (Tr. 377-79.)

A left heart catheterization and coronary angiographic study performed on July 14, 2009, showed an ejection fraction of over sixty percent, patent stents, and no other significant coronary artery disease. Plaintiff was instructed to follow up with Dr. Bragg in two to three weeks and to maintain a low fat, low cholesterol diet. (Tr. 375-76.)

On October 6, 2009, plaintiff complained to Dr. Bragg that he was depressed. It was noted that he had not taken any related medication for two or three years. Plaintiff also complained of continued shoulder pain. Tenderness was noted about the shoulders bilaterally with crepitus and decreased range of motion.

- 17 -

Poor abductor strength was also noted.  Dr. Bragg diagnosed plaintiff with history of severe GERD, anxiety with depression, degenerative joint disease, chronic allergies, and hypertension.  Plaintiff was instructed to continue with his medication for allergies, hypertension, and GERD.  Citalopram and Arthrotec were also prescribed.  (Tr. 288.)

Plaintiff visited Dr. Bragg on March 8, 2010, and reported continued high blood pressure and that he experienced constant pain "all over."  Plaintiff reported that doing any kind of physical work for ten minutes rendered him unable to move for several hours.  Physical examination showed point tenderness almost everywhere on the body.  Some arthritic changes were noted in the hands but with no significant swelling.  Dr. Bragg diagnosed plaintiff with chronic pain – likely fibromyalgia versus polymyalgia rheumatica.  Plaintiff's blood pressure medication was changed, and Lyrica was prescribed.  Laboratory testing was ordered.  (Tr. 285.)  On April 6, plaintiff reported continued high blood pressure. (Tr. 284.)

On August 3, 2010, plaintiff reported to Dr. Bragg that he had been out of his blood pressure medication for several days.  Plaintiff reported that his blood pressure would be fine if he could get through his severe anxiety brought on by domestic issues.  General physical examination was normal.  Dr. Bragg diagnosed plaintiff with anxiety and hypertension, and Lexapro was prescribed.  (Tr. 283.)

Plaintiff visited Dr. Bragg on December 7, 2010, and complained of neck pain. Range of motion about the cervical spine was noted to be generally decreased with tenderness noted on the left side. Plaintiff was diagnosed with somatic dysfunction, and OMT was given with good results. (Tr. 281.)

On February 7, 2011, plaintiff complained to Dr. Bragg that he had had left shoulder pain for about two weeks and had limited use of the shoulder. Tenderness was noted about the shoulder with such tenderness noted to worsen on abduction and external rotation. Plaintiff was noted to have fairly good abductor strength. No motor or sensory deficits were noted. No crepitus was noted. Plaintiff was diagnosed with probable acute bursitis of the left shoulder, and Prednisone and Lorcet were prescribed. (Tr. 280.)

An MRI of the left shoulder dated February 17, 2011, showed degenerative change of the proximal humerus, displacement of the biceps tendon, degenerative change of the acromioclavicular (AC) joint with osteophyte at the tip of the acromion, joint effusion and fluid within the bursa, and findings consistent with torn rotator cuff. (Tr. 275-76.)

Plaintiff visited Dr. Timothy C. Galbraith on February 22, 2011, upon referral from Dr. Bragg for evaluation of left shoulder pain. Plaintiff reported the pain to have developed two years prior with a gradual onset. Plaintiff reported the pain to be aggravated by lifting his arm above his head, elevating the arm,

strenuous activity, activities of daily living, and work. Examination of the cervical spine/neck and right upper extremity was normal in all respects with full and painless range of motion noted about all planes. Examination of the left upper extremity was normal with respect to the elbow, wrist, and hand but yielded positive results demonstrating left impingement syndrome of the shoulder, degenerative rotator cuff tear, and AC arthritis. Surgical options were discussed. (Tr. 439-43.)

An EKG performed on March 15, 2011, in preparation for rotator cuff surgery yielded "completely normal" results. (Tr. 279.)

On March 18, 2011, plaintiff underwent left rotator cuff repair and left subacromial decompression. It was noted that a longstanding torn biceps tendon was irreparable. (Tr. 444-45.) Follow up examination on April 5 showed plaintiff to have full passive range of motion. On June 14, plaintiff exhibited no pain. (Tr. 446, 447.)

On May 3, 2011, Dr. Trung H. Tran performed a cardiac catheterization and stenting of a distal circumflex lesion in response to plaintiff's complaints of increased jaw pain and shortness of breath, worsening with exertion. It was noted that plaintiff had otherwise been doing well with no major complaints. Chronic 100 percent occlusion of the non-dominant mid-RCA was also noted during the procedure, but attempts to wire it were unsuccessful. (Tr. 369-74.)

During follow up examination on May 23, 2011, Dr. Tran noted plaintiff to be doing great and to deny any symptoms. Plaintiff reported having stopped his medication because of all-over body aches. Plaintiff was prescribed Lovastatin and was instructed to follow up in six months. (Tr. 367-68.)

Plaintiff returned to Dr. Tran on November 14, 2011, for follow up and reported that he stopped taking his medication because he could not afford them. Noting the low cost of Lovastatin, Dr. Tran provided a new prescription for the medication. Plaintiff reported having no chest pain or shortness of breath, but his blood pressure was noted to be very high. Plaintiff reported feeling somewhat depressed. Plaintiff also complained of increased fatigue. Physical examination was unremarkable. Plaintiff was diagnosed with CAD, poorly controlled hypertension, hyperlipidemia, history of tobacco abuse, and GERD. In addition to Lovastatin, plaintiff was prescribed Coreg and Amlodipine. (Tr. 484-86.) On December 14, Dr. Tran noted plaintiff to be doing much better and his blood pressure looked "great[.]" No changes were made to plaintiff's treatment regimen. (Tr. 487-89.)

Plaintiff was admitted to the emergency room at Boone Hospital Center on April 23, 2012, with complaints of near syncope, vision disturbances, and transient memory loss. A CT scan of the head showed no abnormality. A chest x-ray showed no acute pulmonary process. ECG testing yielded abnormal results.

Plaintiff was discharged that same date in stable and improved condition. An electroencephalogram performed on April 25 yielded normal results. (Tr. 458-69.)

On May 3, 2012, plaintiff reported to Dr. Bragg that he continued to have lightheadedness and visual disturbances with exertion. Physical examination was normal in all respects. Plaintiff was diagnosed with vertigo, blurred vision, and migraine, and medication was prescribed. (Tr. 470-71.)

Plaintiff returned to Dr. Tran on June 20, 2012, who noted plaintiff to be doing well from a cardiac standpoint with no major problems or issues. Plaintiff reported having memory problems since April 2012, and Dr. Tran referred him to a neurologist. (Tr. 490-92.)

On August 8, 2012, plaintiff complained to Dr. Bragg that he had severe back pain on the left side. Plaintiff was noted to have normal range of motion about the cervical, thoracic, and lumbar spine with no deficits. All muscles in the lower back were tight. Plaintiff was diagnosed with low back pain and was prescribed Lorcet. (Tr. 472-73.) Plaintiff returned to Dr. Bragg the following day with complaints of acute tenderness in both sacroiliac joints with muscle spasm and very poor range of motion. Plaintiff was noted to have difficulty ambulating because of pain. Plaintiff was prescribed Prednisone, Skelaxin, and Nucynta, and an injection of Solu-Medrol was administered. (Tr. 474-76.)

Plaintiff visited Dr. Bragg on September 10, 2012, with questions regarding

disability.  Dr. Bragg indicated that he would write a letter outlining plaintiff's medical history.  (Tr. 495-96.)

In a letter to plaintiff's counsel dated September 13, 2012, Dr. Bragg wrote that plaintiff has "a lot of degenerative lumbar disease with significant arthritis in his hands and his shoulders," significant allergies, and CAD with cardiac intervention.  Dr. Bragg opined:

> I feel very strongly that he can no longer do his job with any type of regularity and especially at a pace that is required for him to make a living.  I feel strongly that this gentleman is somewhat disabled and I don't believe his condition will improve any.
>
> . . . [H]e can no longer do his job adequately.  In fact, hard physical labor, which is what his job entails could certainly be very detrimental to his health.

(Tr. 494.)

On October 25, 2012, Dr. Bragg completed a Physician's Assessment for Social Security Disability Claim (Assessment) in which he reported plaintiff's diagnosed conditions to be degenerative disc disease of the cervical and lumbar spine, CAD–post angioplasty and stent, and chronic allergies and asthma.  Dr. Bragg reported his clinical findings to include arthritic changes of the hands, lumbar spine, and cervical spine; multiple sites of pain, joint stiffness, and swelling; epigastric pain; chronic increased low back pain; and coronary arteriograms showing triple vessel disease.  Dr. Bragg reported plaintiff's symptoms to be chest pain, shortness of breath, sweatiness, and fatigue and that

plaintiff had marked limitations of physical activity. Dr. Bragg reported that plaintiff's cardiac symptoms would interfere with his concentration and attention during twenty percent of an eight-hour day. As to plaintiff's exertional limitations, Dr. Bragg opined that plaintiff could walk two city blocks without rest or severe pain; could stand/walk less than two hours in an eight-hour workday; could sit about two hours in an eight-hour workday; and would require a job that permitted shifting positions between standing, sitting, and walking at will. Dr. Bragg opined that plaintiff would need to take two or three unscheduled breaks during an eight-hour workday and would need to rest from thirty minutes to two hours before resuming his work. Dr. Bragg opined that plaintiff needed to elevate his legs to seventy degrees with prolonged sitting, and would need to elevate his legs during twenty percent of an eight-hour workday. Dr. Bragg opined that plaintiff could occasionally lift and carry up to twenty pounds and could occasionally use his upper extremities for reaching, pushing, and pulling; for grasping and holding; for gross and fine manipulation; and for reaching overhead. Dr. Bragg opined that plaintiff should never crouch or squat and should rarely twist, stoop, bend, climb ladders, or climb stairs. Dr. Bragg further opined that plaintiff should avoid concentrated exposure to extreme cold and heat, high humidity, and wetness; avoid moderate exposure to climbing stairs, solvents/cleaners, fumes, odors, gases, dusts, and chemicals; and avoid all exposure to cigarette smoke. Dr. Bragg opined that

plaintiff needed ten to twelve hours of rest a day and would be absent from work at least three days a month because of his impairments or treatment therefor. Dr. Bragg stated that plaintiff experienced the reported limitations at the reported levels since March 2011. (Tr. 497-99.)

In a Supplemental Physician's Assessment for Social Security Disability Claim (Supplemental Assessment) completed November 30, 2012, Dr. Bragg addressed plaintiff's impairments as they existed on and prior to December 30, 2008, noting that plaintiff had been diagnosed at that time with allergies, anxiety, degenerative joint disease, shoulder pain, sleep apnea, somatic dysfunction, hypertension, IBS, back pain, chronic gastritis, CAD, inguinal hernia, rotator cuff tear, and carpal tunnel. Dr. Bragg reported that symptoms experienced by plaintiff during such time included chest pain, shortness of breath, palpitations, angina-equivalent pain, and fatigue. Dr. Bragg reported that plaintiff's cardiac symptoms would not have interfered with his concentration and attention such that twenty percent of an eight-hour workday would be affected. Dr. Bragg reported no weight restrictions for plaintiff and opined that he would not have been limited to less than six hours standing and walking during said period. Dr. Bragg opined that plaintiff would likely have required unscheduled breaks during an eight-hour workday, but would not have needed two to three such breaks at thirty minutes to two hours each. Dr. Bragg opined that plaintiff would not have needed to elevate his legs on

or prior to December 31, 2008. Finally, Dr. Bragg reported that plaintiff's impairments or treatment therefor would have resulted in plaintiff being absent from work twice a month. (Tr. 501-02.)

## IV. Additional Evidence Considered by the Appeals Council[2]

X-rays dated October 25, 2012, showed mild degenerative changes of the right hip, minimal degenerative changes of the left hip, and minimal degenerative changes of the pelvis. (Tr. 509-10.) X-rays of the lumbar spine showed lumbar spondylosis with mild disc space narrowing, facet arthropathy, and slight anterior spondylolisthesis at L4-L5. (Tr. 511.) X-rays of the sacroiliac joints were unremarkable. (Tr. 512.)

An MRI of the lumbar spine dated March 6, 2013, showed spinal canal stenosis at L4-5 associated with annular bulge, anterolisthesis and posterior hypertrophic changes, lateral annular bulge at L2-3 and L3-4 with foraminal encroachment, and signal changes at L4-5 possibly associated with degenerative changes or stress response secondary to facet arthropathy. (Tr. 513-14.)

## V. The ALJ's Decision

The ALJ found that plaintiff last met the insured status requirements of the

---

[2] The following evidence was not before the ALJ at the time of her decision but was submitted to and considered by the Appeals Council on plaintiff's request to review the ALJ's decision. Because the Appeals Council considered this additional evidence in denying review, the Court must consider it in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

Social Security Act on December 31, 2008.  The ALJ found that plaintiff had not

engaged in substantial gainful activity during the period from October 14, 2005,

through December 31, 2008, the date last insured.  The ALJ found that plaintiff's

CAD, status post myocardial infarction and stent placement, bilateral carpal tunnel

syndrome, and obstructive sleep apnea were severe impairments through the date

last insured, but that plaintiff did not have an impairment or combination of

impairments that met or medically equaled an impairment listed in 20 C.F.R. Part

404, Subpart P, Appendix 1.  (Tr. 13-16.)  The ALJ found that, through December

31, 2008, plaintiff had the residual functional capacity (RFC) to perform light

work[3] except that he could perform

> no overhead reaching; no more than occasional climbing of ramps and
> stairs; no climbing of ladders, ropes or scaffolds; and only occasional
> balancing.  Furthermore, the claimant needed to alternate between
> sitting, standing and walking every 45 minutes at will; could less than
> frequently grip and grasp with one hand; and needed to avoid
> temperature extremes.

(Tr. 17.)

The ALJ found plaintiff unable to perform any past relevant work through

December 31, 2008.  Considering plaintiff's age, education, work experience, and

RFC, the ALJ determined that vocational expert testimony supported a finding

that, through December 31, 2008, plaintiff could perform other work existing in

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal

significant numbers in the national economy, and specifically, film processing clerk, lobby attendant, and children's attendant. The ALJ therefore found that plaintiff was not under a disability from October 14, 2005, through December 31, 2008. (Tr. 23-25.)

## VI. Discussion

A claimant seeking DIB under Title II of the Social Security Act must establish a disability that existed prior to the expiration of his insured status. *Martonik v. Heckler*, 773 F.2d 236, 238 (8th Cir. 1985). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482

_____

of walking or standing, or when it involves sitting most of the time with some pushing and

U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the

claimant is engaged in substantial gainful activity.  If the claimant is working,

disability benefits are denied.  Next, the Commissioner decides whether the

claimant has a "severe" impairment or combination of impairments, meaning that

which significantly limits his ability to do basic work activities.  If the claimant's

impairment(s) is not severe, then he is not disabled.  The Commissioner then

determines whether claimant's impairment(s) meets or equals one of the

impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's

impairment(s) is equivalent to one of the listed impairments, he is conclusively

disabled.  At the fourth step, the Commissioner establishes whether the claimant

can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir.

2002).  Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion.  *Johnson v.*

pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted).  "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation

marks and citations omitted).

    To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and
      non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's
      impairments.

6.    The testimony of vocational experts when required which is
      based upon a proper hypothetical question which sets forth the
      claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

The predominant issue in this case is whether plaintiff was disabled by his impairments before his insured status expired on December 31, 2008. *See Martonik,* 773 F.2d at 238. Plaintiff claims that the medical opinions expressed by Dr. Bragg in his November 2012 Supplemental Assessment showed plaintiff to be so disabled during this period, but that the ALJ wholly failed to consider this opinion evidence in her written decision. Plaintiff contends that the ALJ's failure to consider this opinion evidence from a treating physician runs afoul of the Regulations and constitutes error inasmuch as such evidence addressed the effects of plaintiff's impairments during the relevant period. For the following reasons, the matter will be remanded for consideration of this opinion evidence.

In her written decision, the ALJ summarized plaintiff's testimony and the

medical records detailing plaintiff's impairments and treatment therefor for the

period prior to December 31, 2008, and thereafter.  The ALJ also reviewed the

opinions rendered by Dr. Bragg in September and October 2012 and determined to

accord them less than controlling weight because they addressed plaintiff's then-

current abilities, which was at a time well after the expiration of plaintiff's insured

status on December 31, 2008.  (*See* Tr. 22.)  Indeed, the ALJ noted Dr. Bragg's

statement in the October 2012 Assessment that plaintiff did not first experience the

opined limitations until March 2011.  (*Id.*)  However, as noted by the plaintiff, the

ALJ wholly failed to address the November 2012 Supplemental Assessment

completed by Dr. Bragg, although it was submitted to the ALJ prior to her decision

and was a part of the administrative record before the ALJ.  (*See* Tr. 30.)[4]

An ALJ must explain the weight given to opinions from treating sources,

non-treating sources, and non-examining sources.  20 C.F.R. § 404.1527(e)(2)(ii).

By explaining the weight given to medical source opinions, an ALJ both complies

with the Regulations and assists the Court in reviewing the decision.  *See*

*Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008).  In circumstances where

---

[4] Plaintiff contends that it is unclear whether the administrative record contained this
Supplemental Assessment at the time the ALJ rendered her decision in December 2012.  Given
plaintiff's averment that he submitted this evidence to the ALJ prior to her decision (Pltf.'s Brief,
Doc. #26 at p. 12) and the inclusion of such evidence on the ALJ's List of Exhibits (Tr. 30,
"Physical RFC Assessment, Subsequent to Hearing, Dr. Thomas Bragg, 11/30/2012"), the
undersigned concludes that the administrative record before the ALJ at the time of her decision
contained this Supplemental Assessment.

a medical source opinion may affect the outcome of a case, substantial evidence does not support an ALJ's adverse decision if it cannot be determined what, if any, weight the ALJ afforded the opinion. *McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008); *see also Woods v. Astrue*, 780 F. Supp. 2d 904, 913-14 (E.D. Mo. 2011); *Powell v. Colvin*, No. 4:12 CV 1996 DDN, 2014 WL 1057310, at *12 (E.D. Mo. Mar. 14, 2014).

Here, there is no dispute that the ALJ did not address Dr. Bragg's November 2012 Supplemental Assessment in her decision. As such, this Court is unable to determine what, if any, weight the ALJ afforded the opinion. While the Supplemental Assessment contained opinions regarding plaintiff's exertional limitations that were consistent with the ALJ's RFC finding that plaintiff could perform light work, it also contained an opinion that plaintiff's impairments caused him to miss work twice a month – a limitation that the vocational expert testified would preclude the performance of any work. Because the extent to which the ALJ may credit or discredit Dr. Bragg's November 2012 Supplemental Assessment may affect the outcome of this case, the ALJ's failure to address this Supplemental Assessment and explain the weight given to it renders her decision of non-disability unsupported by substantial evidence. The "primary difficulty is not with the possibility that the ALJ discounted [the] opinion[;] . . . the problem with the ALJ's opinion is that it is unclear whether the ALJ *did* discount [the] opinion, and,

if it did so, why." *McCadney*, 519 F.3d at 767 (internal citation omitted; emphasis in *McCadney*).

The ALJ's failure to address Dr. Bragg's Supplemental Assessment is particularly significant here inasmuch as the only reason articulated by the ALJ for according little weight to Dr. Bragg's September and October 2012 opinions was that they did not address plaintiff's impairments or limitations as they existed on or prior to December 31, 2008. Dr. Bragg's November 2012 Supplemental Assessment, however, did precisely that.

Accordingly, the matter will be remanded to the Commissioner for consideration of Dr. Bragg's November 2012 Supplemental Assessment. Upon such consideration, the ALJ shall weigh this treating physician's opinion in accordance with the Regulations; explain such weight in her written decision; and, in the event she determines not to accord controlling weight to the opinion, shall provide good reasons that are supported by substantial evidence on the record for according it less than controlling weight. *See* 20 C.F.R. § 404.1527(c). The ALJ shall consider all relevant evidence of record in determining what weight to accord Dr. Bragg's Supplemental Assessment, including evidence of the December 2005 sleep study that showed plaintiff to suffer from severe obstructive sleep apnea and evidence of plaintiff's chronic fatigue relating to this impairment as well as to

medication side effects.[5]

In view of the present status of this case, it would be premature for this Court to determine whether the assistance of a medical advisor is required to render an opinion as to the onset of disability.  *Accord Grebenick v. Chater*, 121 F.3d 1193, 1200-01 (8th Cir. 1997) (opinion from medical advisor is required if the existing medical evidence is ambiguous as to whether a disability may have begun prior to the expiration of plaintiff's insurance status).  The Court therefore declines to address plaintiff's claim to the extent he argues that the ALJ erred in failing to obtain such assistance.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

 /s/Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this __10th day of __September, 2014.

_____

[5] In her decision, the ALJ acknowledged that plaintiff was diagnosed with sleep apnea but stated that the evidence did "not show that the claimant underwent a sleep study prior to his date last insured" or experienced "significant problems caused by this impairment[.]"  (Tr. 20.)  Because a review of the record shows the contrary, the ALJ is advised upon remand to re-review the medical and other evidence of record in determining plaintiff's disability status.